[No. 2287.]

## Sherman v. Jones, Administratrix of Reed's Estate.

**Contracts—Principal and Agent—Evidence.**

An allegation by plaintiff that defendant received plaintiff's money, which he agreed to invest in mining stocks and pay plaintiff one-half of the profits, and in case of loss defendant was to bear it alone, was not supported by evidence that defendant, acting on behalf of plaintiff, made such contract with a stockbroker which plaintiff afterwards ratified.

*Appeal from the District Court of El Paso County.*

Mr. William C. Robinson, for appellant.

Messrs. Crowell & Lombard and Mr. Murat Masterson, for appellee.

Thomson, P. J.

Appeal from a judgment recovered by M. A. Reed, since deceased, as plaintiff, against the appellant, as defendant.

The complaint alleged that the plaintiff delivered to the defendant $1,100 in money for invest-

ment in the purchase and sale of mining stocks; that the defendant agreed to invest the money in such purchase and sale, and pay to the plaintiff one-half of the profits received therefrom, and, in case of loss, to pay the loss out of his own funds, and return to the plaintiff, upon demand, the $1,100 delivered to him; that thereafter the defendant engaged in buying and selling mining stocks with that money, and realized profits thereon to the amount of $4,200, of which he paid the plaintiff $750 and no more, and that the plaintiff afterwards made demand upon the defendant for $3,450, the unpaid balance of the profits, and for the original sum of $1,100, but the defendant refused to pay the plaintiff any part of either of such sums. The allegations of the complaint were denied by the answer.

It appears that, personally, the plaintiff had no dealings whatever with the defendant. Her daughter, Mrs. A. R. Jones, now administratrix of her estate, acted for her throughout, and was the principal witness in her behalf. Mrs. Jones testified that she left 25,000 shares of stock, known as Union stock, in the defendant's hands, at Colorado Springs, where she resided, and, after going to Boston, directed him by letter to sell 5,000 shares of that stock, and place the proceeds in bank to her credit, so that she might have it to draw upon at any time; that the defendant sold the stock for $1,153.75, and she again ordered him to place this money in bank to her credit; that on her return to Colorado Springs, having given him no right to use the money, and supposing that it was in the bank to her credit, she met the defendant, and in response to the following question by her counsel, "What did he tell you he had done with it?" replied, "He said, 'there is that money lying in my hands, * * *, and it is not doing anybody any good, and I thought there was a chance to make some money out

of mining stocks, and I put it in the hands of a broker, and he was to protect you against all losses, and he was to have half the profits for his services, and you were to have half the profits, and he has already made for you $100.' " The broker referred to was named Logan. He was not present at the trial, but it was stipulated between counsel that, if present, he would testify that he made an agreement with the plaintiff, through her agent, whereby he used certain of her funds in the hands of the defendant in the purchase of mining stocks, and agreed to guarantee her against any loss arising from the transactions, and to pay her one-half of the profits thereof. This stipulated testimony was introduced in evidence as the testimony of Mr. Logan. Respecting the arrangement between the defendant and Mr. Logan, Mrs. Jones said she did not object to it when informed of it, and consented to it by her silence; and when she was asked, on cross-examination by defendant's counsel, whether she did not sanction it, her attorney answered for her: "She did, because she did not object to it; she went on and wrote him letters and advised with him, and asked him to advise with her; she thought it was going to be a great money-making scheme."

A statement of Logan's stock transactions, had pursuant to the arrangement with the defendant, showing the various purchases and sales, and a statement of accounts between the plaintiff and defendant, showing the several items with which the plaintiff was chargeable and those for which she was entitled to credit, were, in the course of the cross-examination of the defendant as a witness for the plaintiff, introduced in evidence. It would appear from those statements that Logan made his settlements with the defendant, and not directly with the plaintiff. They were admitted without objection, and

we do not find their correctness anywhere disputed.
The first showed a net profit of $228.12; the second
showed total receipts by the defendant for the plain-
tiff, including the $1,153 received for Union stock and
$114.06, one-half the profits realized by Logan, of
$2,230.81, and total payments to her, or on her
account, of $2,246.05, leaving a balance due him of
$15.24. When the plaintiff rested, the defendant
asked judgment of nonsuit, which was refused. He
offered no evidence, and the court instructed the jury.
Error is assigned to the denial of the motion for a
nonsuit, and to each of the instructions given.

We are unable to find any evidence whatever
which tends to support the cause of action stated in
the complaint. A contract was alleged, by the terms
of which the defendant agreed to invest the money of
the plaintiff held by him in the purchase and sale of
mining stocks, and to pay to her one-half the profits
of the transactions; but if they resulted in loss, to
bear the loss himself. Now, not only was there no
proof of any such contract between the plaintiff and
defendant, but the evidence is conclusive that there
was none. There was an agreement between the
defendant, purporting to act in behalf of the plaintiff,
and a broker named Logan, whereby the latter was
to make the investments, account to the plaintiff for
one-half the profits, and guarantee her against loss.
There was some evidence tending to prove that this
agreement was made in pursuance of direct author-
ity from Mrs. Jones, the plaintiff's representative.
This Mrs. Jones denied, but it is immaterial whether
such was the fact or not; for, even if she did not
authorize it at first, she ratified and adopted it after-
wards. When she was advised of it she did not object
to it, and she received and appropriated its results.
The plaintiff's cause of action is based upon it,
although in her complaint she asserted it as a con-

tract between herself and the defendant, but the evi-
dence showed that she had no such contract with the
defendant, so that the contract of which her complaint
purported to state the terms was, in fact, simply the
contract between the defendant, assuming to repre-
sent her, and Mr. Logan. By the position in which,
through Mrs. Jones, the manager of her business, she
chose to place herself with relation to that contract,
and by using it as a foundation for her suit, she made
it her own; in negotiating it, the defendant acted in
the capacity of agent only; and if any liability to her
grew out of the transactions had in pursuance of it,
it was the liability of Logan and not of the defendant.

Counsel for the plaintiff have not seen fit to pre-
sent us with a single reason in justification of this
judgment. In their printed brief they say: "The
sole controversy is over the profits and losses in the
purchase and sale of mining stocks." They then
make the bald statement that there was evidence
showing the liability of the defendant, and cite us to
a number of authorities enunciating the familiar and
unchallenged rule that when the evidence, notwith-
standing it may be conflicting, is sufficient to sustain
the verdict, and the jury are properly instructed, the
appellate court will not disturb the judgment. And
this is the sum total of counsel's presentation to us
of their client's case. Upon what question there was
a conflict of testimony, or as to where a single item
of evidence may be found which tends to show a lia-
bility as against the defendant, we are not favored
with even a hint. All moneys with which the plain-
tiff ever intrusted the defendant, appear to have
been returned to her, together with one-half the net
profits made by Logan on the stocks; and, except for
a portion of Mrs. Jones' testimony in rebuttal, and
certain language of the court in its peculiar, and, in
view of the facts, somewhat extraordinary instruc-

tions, we should be utterly unable to conceive an excuse for this action, or to divine in what respect the plaintiff imagined that a liability had accrued in her favor against any person. But from those sources of information we are led to infer that her claim was that the profits meant by the contract were, not the profits resulting from the several transactions as a whole—that is, the balance found after deducting from the aggregate of profits, where there were profits, the aggregate of losses, where there were losses—but the entire amount of profits on the stocks which were sold at a profit, without deduction on account of losses on other stocks. We find here also an explanation of what counsel mean when they say that "the sole controversy is over profits and losses in the purchase and sale of mining stocks." What construction we should give the contract if its construction were in question, we need not say, because it was not the contract of the person against whom the suit was instituted; although, if it were before us for construction, our opinion would probably not coincide with that of Mrs. Jones. Neither are we called upon to consider the instructions, because the evidence presented no question for submission to the jury. Upon the only matters which were in issue, the plaintiff's evidence left her without a case.

Let the judgment be reversed and the cause remanded with direction to the trial court to set the judgment aside, and allow the defendant's motion for a nonsuit.                                     *Reversed.*